[No. C035616. Third Dist. May 29, 2001.]

ZAXIS WIRELESS COMMUNICATIONS, INC., Plaintiff and
Respondent, v.
MOTOR SOUND CORPORATION et al., Defendants and Appellants.

COUNSEL

James E. Toothman & Associates, James E. Toothman, B. Kimberly Johnson and Eva G. Abrams for Defendants and Appellants.

Edward Freidberg and Stephanie J. Finelli for Plaintiffs and Respondents.

OPINION

**BLEASE, Acting P. J.**—A jury found that Motor Sound Corporation (Motor Sound) committed fraud in inducing Zaxis Wireless Communications, Inc. (Zaxis) to remain as its subagent in selling wireless services. Zaxis was awarded $190,000 in compensatory damages. In a bifurcated proceeding the jury awarded Zaxis $300,000 in punitive damages.

Motor Sound does not contest the finding of fraud, the magnitude of harm to the plaintiff or the amount of compensatory damages. Its sole claim is the punitive damages award was excessive as a matter of law because it lacked the ability to pay by reason of a negative net worth of $6.3 million. The net worth was calculated, inter alia, by deducting a $6 million note to the sole owner of the corporation and $4.9 million of accumulated depreciation.

Motor Sound operates a substantial business. It had average annual revenues for 1997, 1998 and 1999 in excess of a quarter billion dollars but suffered a net loss, after allowing for depreciation and amortization, of $2.5 million in 1998 and $800,000 in 1999. During this period it had a $50 million line of credit with Wells Fargo Bank.

We conclude that Motor Sound had the ability to pay the $300,000 punitive damage award.

We will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Motor Sound and Zaxis were involved in the sale of cellular phones and services.[1] Motor Sound had a contract with AirTouch Communications (AirTouch) to sell phones and services to the public through subagents. Zaxis was a subagent. When Zaxis notified Motor Sound in 1996 that it had agreed with AirTouch to be a direct agent, Motor Sound made various representations to Zaxis, which convinced it to remain as its subagent.

The jury found that Motor Sound's representations were false and fraudulent and awarded Zaxis $234,000 for breach of contract, and $190,000 as compensatory damages for Motor Sound's fraudulent misrepresentations.

The evidence presented at a separate trial of punitive damages consisted of financial statements and the testimony of Motor Sound's chief financial officer, Dennis Pastrik. Pastrik testified that in 1997 Motor Sound's total revenues were $276 million and expenses were $283 million. Net loss for the year was $6.5 million. Motor Sound's total revenues in 1998 were $237 million, and its expenses were $239 million for a net loss of $2.5 million. The balance sheet, as of November 1999, shows a negative net worth of minus $6.3 million.

At the time of trial financial statements (unaudited) were available only for the first 11 months of 1999. They showed total revenues of $257 million and expenses of $258 million. Net loss for the first 10 months of 1999 was $800,000. Cash on hand at the end of the period was $2.2 million. In addition, Pastrik testified that, during the period, the company had a credit line of $50 million.

The jury awarded Zaxis $300,000 in punitive damages. Motor Sound moved for nonsuit at the end of plaintiff's evidence. It contended plaintiff's evidence of punitive damages was insufficient as a matter of law because the evidence showed the defendant had a negative net worth. The court denied the motion, and Motor Sound later moved for judgment notwithstanding the

---

[1] We have not been provided with the reporter's transcript of the liability portion of the trial. The statement of facts is taken from the pleadings. They are unchallenged to the extent we use them here.

verdict. Motor Sound again argued that Zaxis failed to prove ability to pay, an essential component of its prima facie case for punitive damages.

The trial court denied the motion for judgment notwithstanding the verdict and this appeal followed.

## DISCUSSION

 Motor Sound argues the punitive damages awarded are excessive as a matter of law, since the only evidence presented regarding Motor Sound's financial condition revealed it had a negative net worth.

Zaxis maintains the evidence showed Motor Sound had the ability to pay the punitive damages award, even though it had a negative net worth at the time of trial. Zaxis claims the evidence that Motor Sound had average annual revenues in excess of a quarter of a billion dollars, showed a net profit from residuals for telephone charges[2] of approximately $7.5 million, and had a credit line of $50 million, is sufficient to sustain the punitive damage award.[3] We agree.

 "The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980].) The function of punitive damages is not served if the defendant is wealthy enough to pay the award without feeling economic pain. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].) Nevertheless, the award must not be so great that it exceeds the level necessary to punish and deter. (*Ibid.*)

In determining whether a punitive damages award is excessive, the Supreme Court has set forth three factors to guide us: (1) the reprehensibility of

---

[2]Residual income is "a fixed percentage of the cellular telephone companies' monthly charges to end users. Such income is earned over the duration of the end users' use of telephone service and is recognized based on monthly usage reports received from cellular telephone companies."

[3]Zaxis argues Motor Sound waived the right to appeal the punitive damages award because it did not raise the issue in a motion for new trial. The failure to move for a new trial ordinarily precludes a party from arguing on appeal that damages were excessive or inadequate. (*Christiansen v. Roddy* (1986) 186 Cal.App.3d 780, 789 [231 Cal.Rptr. 72].) The trial court is in a better position to determine whether a verdict was influenced by passion or prejudice and the power to weigh the evidence and resolve issues of credibility is vested in the trial court. (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122 [135 Cal.Rptr. 802].)

However, since Motor Sound raised the issue below both by way of a motion for nonsuit and a motion for judgment notwithstanding the verdict, it secured a trial court determination of the issue and preserved it for appeal.

the defendant's conduct; (2) the actual harm suffered; and (3) the wealth of the defendant. (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928.) An award that is reasonable in light of the first two factors may nevertheless be so disproportionate to the defendant's ability to pay that the award is excessive for that reason alone. (*Adams v. Murakami, supra*, 54 Cal.3d at p. 111.) Where the award is grossly disproportionate to the defendant's wealth, a presumption arises that the jury was influenced by passion and prejudice. (*Dumas v. Stocker* (1989) 213 Cal.App.3d 1262, 1267 [262 Cal.Rptr. 311]; *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416].)

▮ The issue before us does not turn on defendant's net worth, but on whether the amount of damages exceeds the level necessary to properly punish and deter. (*Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1299 [13 Cal.Rptr.2d 585].) In the narrow context of this case, where neither the reprehensibility of the defendant's conduct nor the magnitude of harm to the plaintiff is at issue, the question is whether the amount of damages exceeds the defendant's ability to pay. (*Adams v. Murakami, supra*, 54 Cal.3d at p. 111.)

Defendant would have us use net worth as the only measure of its ability to pay, and indeed a number of appellate courts have held punitive damage awards excessive as a matter of law where the award constituted a dispro-portionate percentage of the defendant's net worth. (See, e.g., *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596 [36 Cal.Rptr.2d 343]; *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 516 [262 Cal.Rptr. 689]; *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469-470 [136 Cal.Rptr. 653]; *Merlo v. Standard Life & Acc. Ins. Co., supra*, 59 Cal.App.3d at p. 18.)

However, the Supreme Court has expressly declined to adopt net worth as the standard for determining a defendant's ability to pay in any given situation. (*Adams v. Murakami, supra*, 54 Cal.3d at p. 116, fn. 7 ["Various measures of a defendant's ability to pay a punitive damages award have been suggested. Defendant in this case contends the best measure of his ability to pay is his net worth. . . . We decline at present, however, to prescribe any rigid standard for measuring a defendant's ability to pay."].)

Net worth is too easily subject to manipulation to be the sole standard for measuring a defendant's ability to pay. (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065 & fn. 3 [16 Cal.Rptr.2d 811] [" 'Net worth' is subject to easy manipulation and, in our view, it should not be the only

permissible standard. Indeed, it is likely that blind adherence to any one standard could sometimes result in awards which neither deter nor punish or which deter or punish too much."]; *Michelson v. Hamada, supra,* 29 Cal.App.4th at p. 1596; *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 624-625 [103 Cal.Rptr.2d 492].)

In this case the jury considered net worth and a variety of other factors included on the financial documents presented by Zaxis to conclude Motor Sound had the ability to pay a punitive damage award of $300,000. The evidence showed Motor Sound earned hundreds of millions of dollars in 1997 and 1998 but had a net loss. The financial documents in evidence revealed the net worth calculation included accumulated depreciation of approximately $4.9 million and a note to the sole shareholder of $6 million. Although this represents a loss for accounting purposes, it did not impact Motor Sound's ability to pay a damage award as would, for example, salary and wage expenses. Moreover, at the end of the accounting period at issue, in 1999, Motor Sound had cash on hand and a checking account balance of over $19 million.

Perhaps the most compelling evidence of Motor Sound's ability to pay was Pastrik's testimony that as of the time of trial, Motor Sound had a credit line of $50 million of which $5.3 million was unexpended at the end of 1999. This line of credit indicates the lender made a determination Motor Sound had the ability to pay amounts well in excess of the $300,000 punitive damage award.

■ A reviewing court will reverse as excessive " 'only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .' " (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 927.) An appellate court may reverse an award of punitive damages only if the award appears excessive as a matter of law or is so grossly disproportionate to the ability to pay as to raise a presumption that it was the result of passion or prejudice. (*Id.* at p. 928.)

■ Considering the large volume of Motor Sound's revenues, the ease with which net worth is subject to adjustment for amortization and depreciation, and the fact that Motor Sound had the capacity to borrow $50 million, we cannot say that the award was excessive as a matter of law or so disproportionate to the ability to pay as to indicate passion or prejudice on the part of the jury.

## DISPOSITION

The judgment is affirmed

Sims, J., and Callahan, J., concurred.