[Nos. A131587, A132985. First Dist., Div. Four. Apr. 19, 2012.]

EMILY BANKHEAD, Plaintiff and Respondent, v.
ARVINMERITOR, INC., Defendant and Appellant.

COUNSEL

McKenna, Long & Aldridge, David K. Schultz, Frank K. Berfield and Lisa L. Oberg for Defendant and Appellant.

Kazan, McClain, Lyons, Greenwood & Harley, James L. Oberman, Gloria C. Arnell and Michael T. Stewart for Plaintiff and Respondent.

OPINION

**RUVOLO, P. J.**—In this asbestos personal injury case, a jury found ArvinMeritor, Inc. (ArvinMeritor), liable to Gordon and Emily Bankhead[1] for compensatory and punitive damages. On appeal, ArvinMeritor does not challenge the jury's verdicts as to liability or the amount of compensatory damages. It contends only that the trial court erred in declining to reduce the amount of punitive damages awarded by the jury.

ArvinMeritor disputes the punitive damages award on two grounds: first, that the amount is excessive under California law in light of ArvinMeritor's financial condition, and in particular, the evidence that ArvinMeritor has a negative net worth, and second, that the ratio of punitive to compensatory damages is so high as to violate the due process clause of the United States Constitution, under the guidelines adopted by the United States Supreme Court.

As to the first contention, we hold that there is no legal requirement that punitive damages must be measured against a defendant's net worth. Here, there was expert testimony that ArvinMeritor's net worth was not a reliable indicator of its ability to pay punitive damages, and that other indicators in its financial data merited the amount of the award.

As to ArvinMeritor's second contention, we conclude that the 2.4-to-1 ratio of punitive damages to compensatory damages awarded by the jury did not violate the federal due process clause of the Fourteenth Amendment, or the guidelines for making such awards as articulated by the United States Supreme Court.

Consequently, we affirm.

---

[1] Gordon Bankhead died during the pendency of this appeal. On November 28, 2011, his widow, Emily Bankhead, was substituted in on behalf of his estate. We refer to Gordon Bankhead individually as Bankhead, and use the term "respondents" to refer collectively to Bankhead, his estate, and his widow.

## FACTS AND PROCEDURAL BACKGROUND

As is required on review after a jury trial, in reciting the facts, we "resolv[e] . . . all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict. [Citations.]" (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1137–1138 [74 Cal.Rptr.2d 510] (*Weeks*).) We give only a general summary of the facts relating to liability and compensatory damages, because the details are not germane to the issues presented by this appeal.

ArvinMeritor is the successor in interest to another company, Rockwell,[2] which manufactured brakeshoes for installation on commercial trucks during the timeframe involved in this case. The brakeshoes were fitted with asbestos-containing linings that were manufactured by a number of other companies, including Pneumo Abex LLC (Abex), the respondent in a companion appeal to this one.[3]

By the 1960's, ArvinMeritor knew that workers exposed to asbestos dust were at risk of developing asbestos-related diseases. Indeed, in 1973 and again in 1975, it wrote letters to Abex and other manufacturers complaining about the presence of asbestos dust in the brake linings it was receiving from them. Nonetheless, ArvinMeritor did not place any warnings on its products until the early 1980's, and continued to market asbestos-containing brakes until its inventory of them was exhausted sometime in the early 1990's. Not until the fall of 1987 did ArvinMeritor include an express reference to cancer in the warnings on its products.

Bankhead was exposed to asbestos dust from brake linings during the 30 years he worked at automotive maintenance facilities, primarily as a "parts

---

[2] ArvinMeritor does not dispute its liability for the acts and omissions of Rockwell, its predecessor in interest. Accordingly, we draw no distinction between the two companies, and refer to them collectively as ArvinMeritor.

[3] Respondents originally sued numerous companies alleged to have contributed to Bankhead's asbestos-related mesothelioma. All of the defendants except ArvinMeritor and Abex had settled by the time this case was briefed on appeal. ArvinMeritor and Abex each filed separate appeals from the original judgment. ArvinMeritor's appeal was assigned case No. A131587, and Abex's appeal was assigned case No. A131378 (*Bankhead v. Pneumo Abex, LLC* (A131378, app. pending). After the trial court entered an amended judgment, ArvinMeritor and Abex each appealed from the amended judgment, and the resulting appeals were both assigned case No. A132985 (the joint appeal). All three appeals were consolidated, and only one record was filed. However, we eventually vacated the consolidation, bifurcated the joint appeal, and consolidated each appellant's portion of the joint appeal with that appellant's respective separate appeal. This opinion addresses only the contentions raised by ArvinMeritor in its separate appeal and its portion of the joint appeal. A separate opinion will address Abex's separate appeal and Abex's portion of the joint appeal, which has been redesignated as case No. A135224 (order, Apr. 23, 2012, Ruvolo, P. J.).

man," starting in 1965 and continuing through his retirement in 1999. As a result of this exposure, Bankhead contracted mesothelioma, a form of lung cancer, in 2009. Before his mesothelioma was diagnosed in January 2010, Bankhead experienced difficulty breathing, and underwent painful medical treatment to drain fluid from one of his lungs. After the diagnosis, Bankhead was told he only had 12 months to live,[4] and as his disease progressed, the quality of his life decreased significantly. At trial, Bankhead's medical experts testified that his condition would become increasingly painful until his inevitable death.

After Bankhead's mesothelioma was diagnosed, he sued numerous defendants, including ArvinMeritor and Abex. By the time the case went to trial, Bankhead had settled with all but four of the defendants. The jury found against all of the defendants as to liability, allocating fault 30 percent to each brake lining manufacturer (Abex and one other), 15 percent to each brake-shoe manufacturer (ArvinMeritor and one other), and 10 percent to other defendants. The jury also found all defendants liable for punitive damages.

The jury calculated respondents' economic damages at $1.47 million, including Bankhead's medical expenses, lost earnings, and lost retirement benefits, and the value of the household services he had been providing before he became ill. It also awarded a total of $2.5 million in noneconomic damages for Bankhead's pain, suffering, and emotional distress, and his wife's loss of consortium. Based on its 15 percent share of fault, ArvinMeritor was held jointly and severally liable for the $1.47 million in economic damages, and severally liable for $375,000 of the noneconomic damages, for a total of $1.845 million.[5]

A separate trial was held to determine the amount of punitive damages to be assessed against each defendant. By the time of that trial, all defendants except ArvinMeritor and Abex had settled. At the punitive damages trial, respondents presented an expert witness, Robert Johnson, to testify about ArvinMeritor's financial condition. In evaluating ArvinMeritor's economic status, Johnson reviewed publicly available documents filed with the Securities and Exchange Commission, including ArvinMeritor's 2008, 2009, and 2010 annual 10-K reports; its adjusted 2009 10-K reports; a 2010 proxy statement sent to shareholders; and data regarding its market capitalization. These are "generally accepted financial documents used and relied upon by economists or experts in finance to evaluate a company."

---

[4] As already noted, although Bankhead did live longer than 12 months after his diagnosis, he died during the pendency of this appeal.

[5] In fact, ArvinMeritor's liability for economic damages was reduced to zero after trial, because these damages were offset in their entirety by the proceeds from Bankhead's settlements with other defendants. ArvinMeritor does not contend that this reduction affects the issues presented by this appeal.

Johnson testified that between 2006 and 2010, ArvinMeritor attained over $3 billion in sales revenue each year, and an average annual cashflow profit of $111 million.[6] ArvinMeritor's lowest performing year during that period was 2009, but even in that year, it had $95 million in cash available to it. In 2010, ArvinMeritor's annual sales revenues reached $3.59 billion; its annual report indicated it had earned $211 million in cashflow profit; and it reported to its shareholders that it had earned a $12 million net profit—a conservative figure, as Johnson explained, because companies seek to reduce their reported net income, using legally available deductions such as depreciation, in order to minimize their tax liability. At the end of 2010, ArvinMeritor had on hand some $343 million in cash and cash equivalents, and its outstanding stock had a total market value of almost $2 billion.

ArvinMeritor's chief executive officer, who also served as its board chair and corporate president, earned over $7.6 million in 2010, and stood to receive between $19.9 million and $26.9 million upon leaving the company. Johnson explained that a company's willingness and ability to pay sums of this magnitude to its chief executive is an indicator of financial strength. Given all of these facts, Johnson opined that ArvinMeritor is financially sound.

Johnson acknowledged that ArvinMeritor reported that as of 2010, it had a negative net worth of $1.023 billion. He opined, however, that this number, taken on its own, did not "reflect the full context of ArvinMeritor's financial condition and ability to pay." Johnson explained that net worth is only one of "a number of different tools that we use to assess a company's financial health, wealth and condition," and opined that "net worth is probably one of the least reliable financial metrics or statistics you can use," because there are "a number of financial or accounting transactions" in which a company can engage to lower its net worth, while remaining profitable. Johnson testified that net worth "is not a measure of a company's financial condition totally or their ability to pay," because "even within the guidelines of the generally accepted accounting principles . . . net worth is something that can be pretty easily manipulated." As an example, Johnson noted that a company can reduce its net worth simply by repurchasing shares of its stock.

Johnson explained that because net worth can be unreliable, banks look instead to a company's cashflow and profits, which are the most reliable indicators of its ability to repay debt, in determining whether to lend money to it. For this reason, companies with a negative net worth are still able to

---

[6] Johnson explained that cashflow profit is derived by subtracting from revenue those expense items that actually have to be paid, such as cost of goods sold and salaries, but not subtracting any deductions that do not actually require an expenditure of cash, such as depreciation.

borrow money. Indeed, ArvinMeritor itself borrowed a total of $245 million in 2010, and still had $539 million available on its line of credit as of September 30 of that year.

Johnson also acknowledged that over the past couple of years, ArvinMeritor had been "weathering . . . the financial travails of the economy"; its sales had not gone up, and it had lost some money. He believed, however, that ArvinMeritor was "still a financially sound company" that was "able to meet all of its obligations," was "not anywhere near on the verge of bankruptcy," and had "generally turned the corner." In all but one year (2009) during the period Johnson considered (2006 to 2010), the company's losses resulted primarily from significant capital expenditures, as well as expenses for research and development.

ArvinMeritor's trial counsel cross-examined Johnson, but ArvinMeritor did not offer any expert witness or other evidence to cast doubt on Johnson's methodology or his conclusions. In its opening brief on appeal, ArvinMeritor cites various financial data taken from ArvinMeritor's 2010 annual report. However, though the report was entered into evidence, Johnson was not asked about those particular figures at trial, and they were not called to the attention of the jury.

The jury returned a verdict awarding respondents $4.5 million in punitive damages against ArvinMeritor. ArvinMeritor filed motions for judgment notwithstanding the verdict and for new trial. The trial court denied both motions, and this timely appeal ensued.

## DISCUSSION

### A.   Amount of Punitive Damages Relative to Financial Condition

ArvinMeritor's first argument on appeal is that the punitive damages award is excessive under California law, primarily because of ArvinMeritor's negative net worth. ArvinMeritor argues that because of its financial condition, the award should be stricken altogether, or reduced to $300,000 at most.

### 1.   *Standard of Review*

"In California, a trial court reviews a motion challenging the excessiveness of an award of punitive damages . . . as a 'thirteenth juror': 'The trial court is in a far better position than an appellate court to determine whether a damage award was influenced by "passion or prejudice." [Citation.] In reviewing that issue, moreover, the trial court is vested with the power, denied to us, to

weigh the evidence and resolve issues of credibility. [Citation.]' [Citation.]" (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1689 [26 Cal.Rptr.3d 638] (*Boeken*).) In contrast, we, as an "appellate court[,] cannot reweigh the credibility of witnesses or resolve conflicts in the evidence. [Citation.] [We] must view the conflicting evidence regarding punitive damages in the light most favorable to the judgment pursuant to the familiar substantial evidence rule. [Citation.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 622 [103 Cal.Rptr.2d 492] (*Rufo*).)

Impartial review of a punitive damages award by an appellate court is an important part of the procedural due process to which a defendant subject to punitive damages is entitled under both the state and federal Constitutions. (*Pacific Mutual Life Insurance Co. v. Haslip* (1991) 499 U.S. 1, 15–16 [113 L.Ed.2d 1, 111 S.Ct. 1032]; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1256–1258 [1 Cal.Rptr.2d 301] (*Las Palmas*).) Appellate review for passion and prejudice provides defendants with an additional safeguard to ensure that the award does not exceed an amount necessary to accomplish the societal goals of punishment and deterrence. (*Las Palmas, supra,* at p. 1257.) Accordingly, we review an award of punitive damages to determine whether the award is excessive as a matter of law, or raises a presumption that it is the product of passion or prejudice.

In so doing, we evaluate the award under three criteria: the nature of the defendant's wrongdoing; the actual harm to the plaintiff; and the defendant's wealth.[7] (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980] (*Neal*); see *Adams v. Murakami* (1991) 54 Cal.3d 105, 109–110 [284 Cal.Rptr. 318, 813 P.2d 1348] (*Adams*).) "An appellate court will not reverse the jury's determination unless the award as a matter of law is excessive or appears so grossly disproportionate to the relevant factors that it raises a presumption it was the result of passion or prejudice. [Citations.]" (*Rufo, supra,* 86 Cal.App.4th at p. 623.)

## 2. *Punitive Damages and Defendant's Wealth*

■  Under California law, "[w]ealth is an important consideration in determining the excessiveness of a punitive damage award. Because the purposes of punitive damages are to punish the wrongdoer and to make an example of him, the wealthier the wrongdoer, the larger the award of punitive damages. [Citation.]" (*Downey Savings & Loan Assn. v. Ohio Casualty Ins.*

---

[7] ArvinMeritor's argument under California law focuses on its financial condition, and we do likewise. The nature of ArvinMeritor's wrongdoing and the actual harm to Bankhead are discussed *post* in connection with our federal due process review of the punitive damages award. Suffice it to say that for the reasons expressed *post*, neither of these factors weighs in favor of a reduction of the award under California law.

*Co.* (1987) 189 Cal.App.3d 1072, 1099–1100 [234 Cal.Rptr. 835], citing *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608].) "[O]bviously, the function of deterrence [citation] will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.]" (*Neal, supra,* 21 Cal.3d at p. 928.) Moreover, "[b]oth California and the federal authorities agree that profits earned from tortious activity that supports an award of punitive damages are appropriately considered in the amount awarded. [Citations.]" (*Boeken, supra,* 127 Cal.App.4th at p. 1697.)[8]

■   In assessing whether a punitive damages award is excessive relative to the defendant's wealth, "the key question . . . is whether the amount of damages 'exceeds the level necessary to properly punish and deter.' [Citations.]" (*Adams, supra,* 54 Cal.3d at p. 110.) Calculation of punitive damages "involves . . . 'a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants.' " (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 390 [202 Cal.Rptr. 204] (*Devlin*).) These factors are not evaluated under a rigid formula. "Whether punitive damages should be awarded and the amount of such an award are issues for the jury and for the trial court on a new trial motion. All presumptions favor the correctness of the verdict and judgment. [Citation.]" (*Id.* at pp. 387–388.) " 'Juries . . . have a wide discretion in determining what is proper. [Citation.]' [Citation.]" (*Id.* at p. 390.)

Nonetheless, "[b]ecause the important question is whether the punitive damages will have the deterrent effect without being excessive, an award that is reasonable in light of the . . . reprehensibility of the defendant's conduct and injury to the victims, may nevertheless 'be so disproportionate to the defendant's ability to pay that the award is excessive' for that reason alone. [Citation.] '[T]he purpose of punitive damages is not served by financially destroying a defendant. The purpose is to deter, not to destroy.' [Citation.]" (*Rufo, supra,* 86 Cal.App.4th at p. 620.)

### 3.   *Net Worth as a Measure of Wealth*

■   In the present case, ArvinMeritor's principal ground for contending the award is excessive under California law is its contention that punitive

---

[8] The wealth of a defendant cannot justify a punitive damages award that is otherwise unconstitutional under the federal due process analysis discussed *post.* Nonetheless, the United States Supreme Court recognizes that deterrence is one of the primary purposes of punitive damages, and nothing in the applicable due process cases precludes California courts from relying in part on a defendant's wealth in assessing the appropriate amount of punitive damages. (*Boeken, supra,* 127 Cal.App.4th at p. 1697.)

damages awards are limited to 10 percent of the defendant's net worth, which in ArvinMeritor's case was negative. Contrary to ArvinMeritor's contention, however, net worth is not the only measure of a defendant's wealth for punitive damages purposes that is recognized by the California courts. "Indeed, it is likely that blind adherence to any one standard [of determining wealth] could sometimes result in awards which neither deter nor punish or which deter or punish too much." (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064–1065 & fn. 3 [16 Cal.Rptr.2d 811] (*Lara*).)

"Although net worth is the most common measure of the defendant's financial condition, it is not the only measure for determining whether punitive damages are excessive in relation to that condition. [Citations.]" (*Rufo, supra*, 86 Cal.App.4th at pp. 624–625.) For example, in *Rufo*, the court upheld a punitive damages award that "technically exceed[ed]" the wealthy individual defendant's net worth, because the evidence showed that the defendant would not be financially "destroyed by the award." (*Id.* at p. 625.)

Moreover, as one California court has pointed out, " '[n]et worth' is subject to easy manipulation and . . . should not be the only permissible standard." (*Lara, supra*, 13 Cal.App.4th at p. 1065, fn. 3.) Thus, for example, in *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566 [36 Cal.Rptr.2d 343], the evidence of the defendant's financial condition included net worth statements for two successive years. The first statement, which was prepared for submission to a bank as part of a loan application, showed a far higher net worth figure than the second, which was prepared for use in the litigation. The trial judge called the lower figure " 'patently crooked,' " and the Court of Appeal, although holding the punitive award excessive, agreed that the higher figure was the appropriate one to use for the purpose of determining that question. (*Id.* at pp. 1595–1596.)

In *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577 [107 Cal.Rptr.2d 308] (*Zaxis*), the court affirmed an award of punitive damages in the amount of $300,000, even though the defendant had a negative net worth of $6.3 million, because the evidence showed that the defendant had the ability to pay the award. (*Id.* at pp. 580–581.) The court noted that "the [California] Supreme Court has expressly declined to adopt net worth as the standard for determining a defendant's ability to pay in any given situation. [Citation.]" (*Id.* at p. 582, citing *Adams, supra*, 54 Cal.3d at p. 116, fn. 7.) It agreed that "[n]et worth is too easily subject to manipulation to be the sole standard for measuring a defendant's ability to pay. . . ." (*Zaxis*, at pp. 582–583, citing *Lara, supra*, 13 Cal.App.4th at pp. 1064–1065 & fn. 3.) Noting the "ease with which net worth is subject to adjustment for amortization and depreciation," the court pointed out that in the case before it, "the net worth calculation included accumulated depreciation . . . and a

note to the sole shareholder . . . ," which "represent[ed] a loss for accounting purposes," but "did not impact" the defendant's ability to pay in the same way that salary and wage expenses would. (*Zaxis, supra*, 89 Cal.App.4th at p. 583.)

The *Zaxis* court also noted that the defendant's financial statement showed it had "cash on hand and a checking account balance of over $19 million," as well as a credit line of $50 million, of which $5.3 million remained available to the defendant. The extension of the line of credit "indicate[d] the lender made a determination [the defendant] had the ability to pay amounts well in excess of the . . . punitive damage award." (*Zaxis, supra*, 89 Cal.App.4th at p. 583.) Accordingly, the award was not "excessive as a matter of law or so disproportionate to the ability to pay as to indicate passion or prejudice on the part of the jury." (*Ibid.*)

Similarly, in *Devlin, supra*, 155 Cal.App.3d 381, the court affirmed a punitive damages verdict against a corporation that represented 17.5 percent of its annualized net worth, or almost four months' net profit. (See *id.* at pp. 391–392.) In rejecting the defendant's argument that the award was excessive, the *Devlin* court relied in part on an unexplained accounting adjustment in the company's financial records that operated to reduce its net worth. (See *id.* at pp. 385, 391.) The court also took note of a resolution authorizing the corporation to borrow money, opining that a resolution to borrow "serves as an indicator of the continuing health and viability of a business." (*Id.* at p. 391.) The *Devlin* court "compiled a list of cases in an attempt to discover a formula for determining whether a given percentage of net worth is excessive ultimately concluded there is no formula, and that each case must be decided on its own facts, considering . . . various indicators of wealth. . . ." (*Rufo, supra*, 86 Cal.App.4th at p. 625, citing *Devlin, supra*, 155 Cal.App.3d at pp. 388–389, 391–392.) Thus, the court held that in arriving at the amount of punitive damages, the trial court properly took into account the defendant's "net worth plus a variety of other figures relating to [the defendant's] wealth," and noted that "[o]ther courts have considered various asset and income figures relevant to the issue of punitive damages." (*Devlin, supra*, at p. 391.)

ArvinMeritor's challenge to the punitive damages award relies primarily on a plethora of older California cases to the effect that punitive damages amounting to more than 10 percent of the defendant's net worth are excessive. The most recent case ArvinMeritor cites for this proposition is *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1162–1163 [85 Cal.Rptr.2d 726]. In that case, the court affirmed a punitive damages award amounting to between 2 and 3 percent of defendant's net worth. As part of

the rationale for affirming the award, the court noted that it was "far less than the 10 percent cap generally recognized by our courts. [Citation.]" (*Id.* at p. 1163.)

ArvinMeritor also relies for this point on *Weeks, supra,* 63 Cal.App.4th at pages 1166–1167. In that case, the court affirmed an award that the trial judge had reduced to 5 percent of the defendant's net worth. In so doing, the court noted that "[i]t has been recognized that punitive damages awards generally are not permitted to exceed 10 percent of the defendant's net worth. [Citation.]" (*Id.* at p. 1166, fn. omitted.)

In *Michelson v. Hamada, supra,* 29 Cal.App.4th at pages 1595–1596, the court vacated an award of punitive damages equal to 28 percent of the defendant's net worth, and remanded for remittitur or retrial. In that context, the court noted that punitive damages "awards generally are not allowed to exceed 10 percent of the net worth of the defendant. [Citation.]" Similarly, in *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 514–516 [262 Cal.Rptr. 689], in reversing an award amounting to 33 percent of the defendant's net worth, the court indicated that "punitive damage awards are generally not allowed to exceed 10 percent of the defendant's net worth . . . ."

In *Seeley v. Seymour* (1987) 190 Cal.App.3d 844 [237 Cal.Rptr. 282], which arose from the defendant's "unethical business tactics," the court vacated as excessive an award of $2.66 million in punitive damages, which was equal to 13.3 times the compensatory damages, and remanded for a new trial on both compensatory and punitive damages. While expressly declining to compare the punitive damages to the defendant's net worth, the court remarked in dictum that "awards totalling more than 10 percent of a defendant's net worth have been disfavored by our courts . . . ." (*Id.* at pp. 868–869.)

In *Burnett v. National Enquirer, Inc.* (1983) 144 Cal.App.3d 991 [193 Cal.Rptr. 206], a defamation case, the court held that an award of $1.3 million in punitive damages, which the trial court had reduced to $750,000, was still excessive, inasmuch as it amounted to 35 percent of the defendant's $2.6 million net worth. The court ordered a new trial unless the plaintiff accepted a reduction to $150,000. (*Id.* at pp. 997, 1012, 1018–1019.) This figure was three times the compensatory damages, and fell between 5 and 6 percent of the defendant's net worth, but the court did not rely on either of these facts. Indeed, the court did not articulate any rationale for the choice of the $150,000 figure, and made no reference to any set limitation on punitive damages as a percentage of net worth.

In *Goshgarian v. George* (1984) 161 Cal.App.3d 1214 [208 Cal.Rptr. 321], the court noted that "punitive damage awards exceeding 10 percent of a defendant's net worth have generally been disfavored by the appellate courts" (*id.* at p. 1228, italics omitted), and on that basis, concluded that a punitive damages award amounting to approximately 10.7 percent of the defendant's net worth was *not* unduly disproportionate to his wealth (*id.* at pp. 1227–1229). The court did hold the amount of punitive damages awarded was too large, but only because the defendant's conduct in draining his swimming pool across his neighbors' property was not sufficiently reprehensible to support such a large award. (*Id.* at pp. 1229–1230.)

In *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469–470 [136 Cal.Rptr. 653], the court held that a punitive damages award of $2.5 million, which was more than 15 percent of the defendant's net worth, and 14 times the compensatory damages, was excessive as a matter of law. It ordered a new trial unless the plaintiff agreed to reduce the award to the amount of punitive damages originally demanded in her complaint, which was $250,000.

In *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416], the court reversed the award of punitive damages on a number of grounds, including that the amount of the award was almost one-third of the defendant's net worth, as shown by the uncontradicted evidence. It remanded for a retrial on liability for punitive damages, as well as the amount. In neither of these cases did the court make any mention of any fixed limitation on punitive damages as a percentage of the defendant's net worth.

ArvinMeritor argues these cases establish, as a matter of law, that punitive damages may not exceed 10 percent of the defendant's net worth, which represents a "cap" on allowable punitive damages awards. However, as shown by our summaries in the preceding paragraphs, none of the cited cases actually *held* that punitive damages exceeding 10 percent of the defendant's net worth are per se impermissible. Moreover, these cases cannot be read as requiring punitive damages to be measured only against the defendant's net worth despite undisputed expert testimony that the defendant's net worth is not an accurate measure of its wealth.

Here, the jury was entitled to credit Johnson's uncontroverted testimony that ArvinMeritor was far wealthier than its stated net worth would indicate, and that net worth alone is an untrustworthy standard, because it is so easily manipulated. Johnson's caveat about the perils of relying solely on a net worth valuation standard echoed the same concerns expressed by the courts in the relatively more recent *Zaxis*, *Rufo*, *Lara*, and *Devlin* cases. (*Zaxis, supra,* 89 Cal.App.4th at p. 582; *Rufo, supra,* 86 Cal.App.4th at p. 621; *Lara, supra,*

13 Cal.App.4th at pp. 1064–1065 & fn. 3; *Devlin, supra*, 155 Cal.App.3d at pp. 391–392.) Thus, we reject the argument that 10 percent of net worth constitutes a ceiling above which juries may not go in setting the amount of punitive damages.

The issue before us on review is not whether the award exceeds some specified percentage of the company's net worth. Rather, it is whether the trial court abused its discretion in determining that the amount of punitive damages awarded by the jury was not the result of passion or prejudice. Our task simply is to determine whether, "[c]onsidering all the factors, the punitive damages award, 'in light of the defendant's wealth and the gravity of the particular act,' . . . exceed[s] 'the level necessary to properly punish and deter.' [Citation.]" (*Rufo, supra*, 86 Cal.App.4th at p. 625.)

The size of the jury's punitive damages verdict, and the trial judge's denial of ArvinMeritor's motions for judgment notwithstanding the verdict and for new trial, imply that both the jury and the trial judge accepted Johnson's assessment as to ArvinMeritor's ability to pay the $4.5 million punitive damages award. This implied factual finding is fully supported by the evidence.

As already noted, in 2010, ArvinMeritor earned a cashflow profit of $211 million, and reported a net profit of $12 million. The 2010 compensation of its CEO was $7.6 million. Moreover, while the company had a negative net worth of $1.023 billion, it was able to borrow $245 million in 2010, and had $343 million in cash or the equivalent at its disposal as of the end of the year.

■    The jury's punitive damages award of $4.5 million amounted to 37.5 percent of ArvinMeritor's net profit for 2010. While this is hardly a slap on the wrist, $4.5 million is only a small percentage—about 1.3 percent—of ArvinMeritor's immediately available funds as of the end of 2010. It is significantly less than what ArvinMeritor paid its CEO that year, and less than one-fourth of the amount ArvinMeritor had promised to pay its CEO if he were fired without cause ($24.5 million) or replaced if the company were sold ($26.9 million). Moreover, Johnson's testimony that the company was financially sound was uncontroverted, and ArvinMeritor chose not to introduce evidence tending to show that it would be financially destroyed by an award of $4.5 million in punitive damages.[9]

---

[9] At oral argument, ArvinMeritor's counsel warned that affirming the punitive damages award in this case could lead to plant closures, layoffs, and other dire consequences. Nothing in the record supports these speculative contentions. ArvinMeritor also argues that it should not be faulted for its failure to controvert Johnson's testimony about its financial condition, citing *Adams, supra*, 54 Cal.3d 105. In that case, the Supreme Court opined that "[i]t is inherently prejudicial to require a defendant to introduce evidence of personal finances" (*id.* at p. 120),

Under these circumstances, we cannot say that the jury's punitive damages award, though large, is so disproportionate to ArvinMeritor's ability to pay as to lead ineluctably to the conclusion that the award resulted from passion or prejudice. Rather, the jury was justified by the evidence in concluding that an award of that magnitude was necessary and appropriate in order to punish ArvinMeritor for its contribution to causing the disease that took Bankhead's life, and to deter ArvinMeritor and other manufacturers from failing to take every available precaution to mitigate workers' exposure to life-threatening toxic substances.

## B. Due Process Constraints on Punitive Damages

As an additional ground for striking or reducing the punitive damages award, ArvinMeritor argues that the size of the award exceeds the federal constitutional limits applicable to state court punitive damages awards. These limits were articulated in a line of United States Supreme Court cases culminating in *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*). (See also *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 433 [149 L.Ed.2d 674, 121 S.Ct. 1678]; *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*BMW*).)

### 1. *Nature of Constraints and Standard of Review*

■ "The due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages. [Citations.]" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 [101 Cal.Rptr.3d 773, 219 P.3d 749] (*Roby*); see *State Farm, supra*, 538 U.S. at pp. 416–418; *BMW, supra*, 517 U.S. at p. 568.) "The imposition of 'grossly excessive or arbitrary' awards is constitutionally prohibited, for due process entitles a tortfeasor to ' "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." ' [Citation.]" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).)

"In *State Farm*, the high court articulated 'three guideposts' for courts reviewing punitive damages: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm

---

citing a treatise advising defense counsel in insurance bad faith cases to " 'be careful about presenting "mitigating" evidence as to [the defendant's] financial condition,' " lest the jury " 'regard it as a tacit admission that some award of punitive damages is appropriate.' " (*Id.* at p. 121.) *Adams* did not hold, however, that a defendant facing a punitive damages claim cannot or should not present evidence to controvert the plaintiff's factual showing regarding the defendant's financial condition. It held only that plaintiffs who seek punitive damages have the burden of presenting evidence, as well as the burden of proof, regarding the defendant's finances. (See *id.* at pp. 119–123.)

suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' [Citations.]" (*Roby, supra*, 47 Cal.4th at p. 712, quoting *State Farm, supra*, 538 U.S. at p. 418.)[10] Our own Supreme Court has characterized the constitutional test as "a three-factor weighing analysis looking to the nature and effects of the defendant's tortious conduct and the state's treatment of comparable conduct in other contexts." (*Simon, supra*, 35 Cal.4th at pp. 1171–1172.)

In adjudicating a due process challenge to a punitive damages award, we review the express or implied factual findings of the trier of fact under the deferential substantial evidence test. However, we make our own "independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.]" (*Simon, supra*, 35 Cal.4th at p. 1172.)

### 2. Reprehensibility of ArvinMeritor's Conduct

■ "Of the three guideposts that the high court outlined in *State Farm, supra*, 538 U.S. at page 418, the most important is the degree of reprehensibility of the defendant's conduct. On this question, the high court instructed courts to consider whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' [Citation.]" (*Roby, supra*, 47 Cal.4th at p. 713.)

In the present case, all of these factors weigh in favor of a high degree of reprehensibility. As the court put it in *Boeken, supra*, 127 Cal.App.4th at page 1690, "intentionally marketing a defective product knowing that it might cause injury and death is 'highly reprehensible.' [Citation.]" In the present case, Bankhead contracted a painful cancer, and ultimately died, due to ArvinMeritor's (and the other defendants') failure to ensure that people like

---

[10] As noted in *Simon, supra*, 35 Cal.4th at pages 1183–1184, the factor of civil penalties for comparable misconduct is not particularly useful in a case involving only common law tort duties. In two tobacco-related personal injury cases, California courts have found the civil penalty comparability factor essentially irrelevant. (See, e.g., *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 570 [131 Cal.Rptr.3d 382] (*Bullock*); *Boeken, supra*, 127 Cal.App.4th at p. 1700.) We conclude, as did the trial judge, that the same is true of asbestos-related personal injury cases, and will confine our analysis to the reprehensibility and relationship to actual or potential harm factors.

Bankhead who used or worked with asbestos-containing products were not exposed to lethal asbestos dust. ArvinMeritor's conduct continued over many years, and evinced an indifference to or reckless disregard of the health and safety of Bankhead and those similarly situated. (See *Philip Morris USA v. Williams* (2007) 549 U.S. 346, 355 [166 L.Ed.2d 940, 127 S.Ct. 1057] ["Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible . . . ."]; see also *Bullock, supra,* 198 Cal.App.4th at pp. 559–561 [in determining reprehensibility, court relied on fact that tobacco company knew many smokers would suffer death or serious injury, but sought for many years to convince public that health concerns regarding smoking were unfounded].)

ArvinMeritor argues that Bankhead was not financially vulnerable. We disagree. As industrial workers, Bankhead and others who were exposed to asbestos fibers on the job were financially vulnerable in that they could not avoid the exposure without leaving their employment. (See generally *Roby, supra,* 47 Cal.4th at p. 713 [characterizing a "relatively low-level employee" as financially vulnerable to employer's discrimination and harassment]; *Gober v. Ralphs Grocery Co,* (2006) 137 Cal.App.4th 204, 220 [40 Cal.Rptr.3d 92] (*Gober*) [group of grocery store employees who relied on their jobs for their livelihood were financially vulnerable]; *Boeken, supra,* 127 Cal.App.4th at p. 1691 [characterizing consumers of tobacco products as financially vulnerable]).[11]

Finally, we come to the issue of intentional, repeated conduct versus a one-time accident. The jury found against ArvinMeritor on those issues, concluding that ArvinMeritor was 15 percent responsible for the damages resulting from Bankhead's asbestos exposure, and that it acted with malice, fraud, or oppression. Our obligation to conduct a due process analysis regarding punitive damages does not create an opportunity for ArvinMeritor to make an end run around those factual findings. (Cf. *Gober, supra,* 137 Cal.App.4th at p. 214 ["in deciding the constitutional maximum, a court does not decide whether the verdict is unreasonable based on the facts . . ."].) While there is no evidence that ArvinMeritor intended to injure Bankhead or anyone else in particular, its prolonged failure to take adequate measures to protect people who worked with its products against a known hazard to their health and safety justifies the jury's conclusion that its conduct towards workers exposed to the hazards in its products was malicious, fraudulent, or oppressive.

---

[11] ArvinMeritor also argues that respondents' counsel conceded Bankhead was not financially vulnerable in closing argument, when counsel argued this case "isn't a financial transaction, so that's [financial vulnerability] not really important." To acknowledge that respondents' financial vulnerability need not be a key factor in the jury's deliberations was not a concession that it did not exist.

ArvinMeritor attempts to minimize its degree of reprehensibility by emphasizing that the jury determined it was only 15 percent at fault for Bankhead's exposure to asbestos. Neither *State Farm, supra*, 538 U.S. 408, nor any of the cases on which ArvinMeritor relies holds that a defendant's degree of reprehensibility for punitive damages purposes is affected by whether the conduct of others was concurrently responsible for the plaintiff's injuries. Rather, for the purpose of the punitive damages analysis, the proper role of the jury's finding assigning ArvinMeritor a low percentage of liability is to reduce the amount of compensatory damages with which the amount of punitive damages is compared, when considering the ratio between the two. (See next pt. of discussion, *post*.) Thus, ArvinMeritor's low percentage of liability for compensatory damages may reduce its punitive damages exposure, but not in the way ArvinMeritor argues.

ArvinMeritor also argues that its degree of reprehensibility is reduced because starting in the 1980's, it warned persons who were exposed to its products that they should avoid breathing asbestos dust, and, as early as the mid-1970's, it took measures to reduce the amount of dust associated with its products. This may be so, but it does not mean, as ArvinMeritor asserts, that the punitive damages in this case cannot constitutionally exceed the amount of compensatory damages.

Neither of the cases cited by ArvinMeritor for this proposition so holds. In *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48 [29 Cal.Rptr.2d 615], the trial court's order granting the defendant a nonsuit on the plaintiff's punitive damages claim was affirmed, because no reasonable jury could have found malicious conduct by clear and convincing evidence. (*Id.* at pp. 58–62.) Similarly, in *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847 [93 Cal.Rptr.2d 364], a first-party business insurance bad faith case, the court held that due to the complexity of the insurance coverage issues involved, the award of punitive damages was not supported by clear and convincing evidence of contemptible or despicable conduct. (*Id.* at pp. 890–893.) Here, ArvinMeritor does not dispute that the evidence was sufficient to support the jury's verdict finding it liable for punitive damages. Accordingly, *Hoch v. Allied-Signal, Inc.* and *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* are not germane to the issues presented.

We find *Weeks, supra*, 63 Cal.App.4th 1128, far more pertinent on this point. In that case, the defendant argued that the punitive damages award against it should have been reduced because of measures it took to avoid a recurrence of the sexual harassment on which the award was based. The court was "not persuaded that the award should have been reduced because of the evidence that [the defendant] has 'learned its lesson,' and thus will be

deterred from like conduct in the future. Limiting an award because of a defendant's contrition certainly encourages contrition. It also, however, reduces the risk that serious consequences will result from failing to prevent the wrongful conduct in the first place. Limiting an award because of a defendant's contrition therefore undermines the purpose of punitive damages." (*Id.* at p. 1167.)

Similarly here, limiting the award in this case would undermine the purpose of punitive damages by giving undue credit to ArvinMeritor's belated efforts to warn users of its products about the hazards of asbestos, which the jury implicitly found were ineffective and inadequate. Allowing the award to stand, on the other hand, will serve the purposes of punishment and deterrence by encouraging ArvinMeritor and other manufacturers, in the future, to take every available step to eliminate life-threatening hazards from their products and manufacturing processes altogether, rather than relying on workers and consumers to protect themselves from dangers they may not be in a position to fully understand or entirely avoid.

### 3. *Range of Constitutionally Acceptable Ratios*

■ The second part of the federal due process analysis focuses not on the absolute *amount* of punitive damages, but rather on the appropriate *ratio* between the compensatory and punitive damages, given the specific facts of the case. That is, "punitive damages must bear a ' "reasonable relationship" ' to compensatory damages or to the actual or potential harm to the plaintiff. [Citations.]" (*Bullock, supra,* 198 Cal.App.4th at p. 563, quoting *BMW, supra,* 517 U.S. at pp. 575, 580; see also *State Farm, supra,* 538 U.S. at pp. 424–426.)

California published opinions on this issue have adopted a broad range of permissible ratios—from as low as one to one to as high as 16 to 1—depending on the specific facts of each case. The low end of the range is exemplified by *Roby, supra,* 47 Cal.4th 686. *Roby* was an employment discrimination and harassment case involving primarily emotional harm to the plaintiff, with a minor physical component, and no evidence of repeated discriminatory acts by the defendant. Noting that the jury's award of substantial emotional distress damages already included a punitive element, a majority of our Supreme Court held that the maximum constitutionally permissible ratio of punitive to compensatory damages was one to one. (*Id.* at pp. 718–719.) The two justices in the minority would have applied a two-to-one ratio. (*Id.* at pp. 722–724 (conc. & dis. opn. of Werdegar, J.).)

A more recent case falling toward the low end of the range is *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538

[107 Cal.Rptr.3d 307] (*Amerigraphics*). *Amerigraphics* was a first party insurance bad faith case in which the plaintiff was a small printing business whose premises and equipment were damaged by a water leak. The only factor weighing in favor of a high degree of reprehensibility was the plaintiff's financial vulnerability, particularly in that the insurance company's "egregious conduct put Amerigraphics out of business." (*Id.* at p. 1566; see *id.* at pp. 1562–1563.) On the other hand, there was no punitive element to the compensatory damages, and the defendant was a wealthy insurance company. Relying in part on the defendant's concession that $500,000 in punitive damages would be appropriate, the court held that sum to be constitutionally permissible. This resulted in a 3.8-to-1 ratio of punitive to compensatory damages. (See *id.* at p. 1566.)

An example of a ratio a few steps up the scale is the six-to-one ratio permitted in *Gober, supra*, 137 Cal.App.4th 204. *Gober* was a sexual harassment case based on the treatment of several employees by a single manager, in which the trial court remitted each plaintiff's punitive damages to 15 times her compensatories, and both parties appealed. On appeal, the court rejected the employer's contention that the punitive damages should not exceed three times the compensatory damages. Instead, it held that a six-to-one ratio between punitive and compensatory damages was the appropriate constitutional maximum. The court applied this ratio even though the employer's conduct was only moderately reprehensible, in that the manager did not cause or threaten any physical injury to the plaintiffs, and the employer transferred the manager promptly after his misconduct was reported. (See *id.* at pp. 219–223.)

An even higher ratio was approved in *Simon, supra*, 35 Cal.4th 1159, which arose out of an aborted commercial real estate transaction. In *Simon*, the defendant's single act of fraud caused the plaintiff only $5,000 in compensatory damages; did not involve any physical harm or threat to health and safety; and did not target a particularly vulnerable plaintiff. Nonetheless, because of the defendant's substantial wealth, and the lack of any punitive element in the relatively small compensatory damages award, the Supreme Court held that a 10-to-1 ratio could properly be applied. (*Id.* at pp. 1188–1189.) In so doing, the court interpreted *State Farm, supra*, 538 U.S. at page 425, as "establish[ing] a type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification . . . , cannot survive appellate scrutiny under the due process clause." (*Simon, supra*, 35 Cal.4th at p. 1182, fn. omitted.) The court emphasized, however, that the presumption of suspectness applies only to ratios that exceed the limit " 'to a significant degree,' " and even then, the

presumption may be rebutted by "extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages." (*Id.* at p. 1182 & fn. 7.)

Finally, in a recent product liability case involving a manufacturer's intentional deceit of the public as to the safety of its product—to wit, the cigarettes that ultimately killed the plaintiff—the court in *Bullock, supra,* 198 Cal.App.4th 543, approved a punitive damages award of approximately 16 times compensatory damages. Relying in part on *Simon, supra,* 35 Cal.4th 1159, the court held that the "extreme reprehensibility" of the defendant tobacco company's conduct, including its "vast 'scale and profitability,' " when coupled with the relatively small size and nonpunitive nature of the compensatory damages award, rebutted the presumptively suspect nature of the 16-to-one ratio, and justified affirming the jury's punitive damages award. (*Bullock, supra,* 198 Cal.App.4th at pp. 560–563, 565–566, 569 & fn. 16, 573.)

## 4. *Analysis*

■ As already noted, ArvinMeritor's conduct was highly reprehensible. The jury's award of $2.5 million in noneconomic damages for Bankhead's pain and suffering and his wife's loss of consortium is high enough that it appears to include a punitive component. The inclusion of a punitive element in emotional distress damages reduces the permissible ratio of punitive to compensatory damages. (See, e.g., *Roby, supra,* 47 Cal.4th at pp. 718–720 [award of $1.3 million as compensatory damages for emotional distress included punitive component; one-to-one ratio of punitive to compensatory damages was constitutional maximum]; *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th 965, 974 [63 Cal.Rptr.3d 507] [in insurance bad faith case, award of $750,000 each to two plaintiffs for emotional distress included punitive element; trial court correctly reduced punitive damages to $1.5 million]; *Gober, supra,* 137 Cal.App.4th at pp. 219, 222–223 [where bulk of harm to plaintiffs from manager's sexual harassment was emotional injury, compensatory damage awards ranging from $50,000 to $75,000 contained a punitive element; maximum ratio of punitive to compensatory damages was six to one].)

Here, the jury's award resulted in an amount of punitive damages equal to approximately 2.4 times the $1.845 million share of compensatory damages for which ArvinMeritor was held liable. This single-digit ratio is well within the range for comparable cases, and is not extraordinarily high. Accordingly, we are not persuaded that the award exceeded the constitutionally permissible limits.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Rivera, J., and Sepulveda, J.,* concurred.

On April 25, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 11, 2012, S202851. Cantil-Sakauye, C. J., did not participate therein.

---

*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.