Filed 10/7/13  Trattman v. Key CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DIETER TRATTMANN, | B241337 c/w B243406 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BC277311) |
| GARRISON KEY, | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Deirdre H. Hill, Judge.  Affirmed in part, reversed and remanded in part.

Garrison Key, in pro. per., Appellant.

Sands & Associates, Leonard S. Sands and Heleni E. Suydam, for Respondent.

_____

# INTRODUCTION

This case is before us for a second time. The underlying facts are set forth in detail in our prior opinion in case No. B204150, filed on June 22, 2010, and need not be restated here. Briefly, in 2007, following a bench trial on plaintiff and respondent Dieter Trattmann's complaint for damages for fraud and quiet title, among other things, the trial court found defendant and appellant Garrison Key fraudulently recorded deeds in his own name associated with 11 properties. The judgment entered in favor of Trattmann and against Key quieted title in 9 of the 11 properties in the names of Trattmann and Key in equal shares as tenants in common, awarded Trattmann damages in the amount of $159,808.50 (lost rent, increased tax liability and costs of sale); and held Key liable for all of the yet to be determined costs and fees associated with the receiver appointed to manage the subject properties during the litigation (the September 2007 judgment). In the prior opinion, we affirmed the liability findings against Key and remanded for a further trial on whether Trattmann was also entitled to punitive damages. We found Key's challenge to the receivership cost award premature since the Receivership Court had not yet approved a final accounting and costs.

In January 2012, following remand, the Receivership Court approved total costs and fees of $2,179,461, most of which had already been paid out of the receivership estate. On Trattmann's motion for clarification, the trial court ordered Key to pay Trattmann that amount as additional damages, without credit for payments made to the receiver attributable to Key's half of the receivership estate (the March 2012 clarification order). In case No. B241337, Key appeals from the March 2012 clarification order.

Following a three-day trial, the trial court awarded Trattmann punitive damages in the amount of $150,000 (the June 2012 punitive damages award). In case No. B243406, Key appeals from the June 2012 punitive damages award.

We consolidated case Nos. B241337 and B243406 for purposes of oral argument and decision. We affirm the June 2012 punitive damage award but reverse the March 2012 clarification order and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Punitive Damages (Case No. B243406)*

Judge Conrad Aragon, who presided over the bifurcated liability (Phase I) and damages (Phase II) trials, was unavailable following our remand so Judge Deidre Hill presided over the punitive damages trial (Phase III) from September 20 through 23, 2011. The appellate record does not include a Reporter's Transcript of the trial, at which Trattmann, Key and the court appointed receiver (Thomas Coleman) testified. According to the trial court's final statement of decision, Key testified that he was not employed, received monthly social security disability payments, had not filed tax returns for himself or for three LLC's of which he was the sole owner and neither he nor the LLC's had any bank accounts. The properties in the LLC's generated rental income which was collected by the property managers; Key assumed the property managers deposited the rental income into their own bank accounts; he had no access to any accountings for the rents or expenses of the properties. A licensed real estate broker, Key rendered an opinion as to the value of the properties in response to written interrogatories and at trial. As of June 30, 2011, the receivership costs totaled $2,099,337. The receiver testified that this amount had "just about been paid in full from the assets and income of the estate." During the course of the receivership, four properties "were necessarily sold," presumably to pay these costs.

In its December 2011 tentative statement of decision, the trial court found Key's net worth to be $1,505,291 and awarded punitive damages to Trattmann in the amount of $150,000 – almost exactly 10 percent of Key's net worth. Key objected that the net worth calculation did not include a deduction for Key's liability for the receivership costs. In its final Statement of Decision And Order For Plaintiff To Prepare Proposed Judgment, filed on February 29, 2012, the trial court found Key's net worth to be $1,505,291, comprised of the value of properties Key transferred into the three LLCs of which he was the sole owner, as well as the value of Key's fifty-percent ownership

3

interest in the receivership estate.  The trial court concluded:  "In view of Key's financial condition, this court finds that an award of punitive damages in the amount of $150,000 is necessary and appropriate to punish [Key] and discourage future wrongful conduct.  The court has taken into consideration the [$159,808.50 in compensatory damages awarded in Phase II].  This court has not considered the costs of the receivership as included in the total compensatory damages for comparing the ratio of compensatory damages to punitive damages."[1]  Judgment was entered on June 21, 2012.  Key timely appealed.

## B.    Receivership Costs And Fees (Case No. B241337)

Following Phase II of the trial, Trattmann had submitted a proposed judgment.  Key objected to paragraph 10:  "While [he] disagrees with the court's decision, he believes the Court intended in the Phase II Statement of Decision that [Key] reimburse Trattmann for Trattmann's share of the Receiver's fees and costs, and those of his 'agents and employees', since those have been paid to date out of jointly-held properties (either [from the proceeds of the sale of a jointly owned property] or through Preferred Bank borrowings secured by [other jointly held properties].  Thus, Key already has 'paid' 50 [percent] of the fees and costs to date, just as Trattmann has."

In a Minute Order dated September 14, 2007, the trial court stated that it was deleting paragraph 10 of the proposed judgment and replacing it with the following

---

**1**      The trial court found Key "lacked credibility. . . .  His attitude gave the impression that he was vengeful, non-contrite and intent on fulfilling a still present desire to inflict further injury on Trattmann."  "By contrast, Trattmann's testimony rang truthful. . . . Although the history of events demonstrate that Key has caused Trattmann financial devastation and severe distress over a prolonged period, Trattmann seemed resigned to move forward without evidencing a strong overriding resentment which he might be expected given the circumstances."  The trial court characterized Key's conduct as "outrageously reprehensible."  "Key did not commit just one act of fraud.  He wrongfully recorded multiple deeds and then engaged in a long course of dispossessing Trattmann of his properties, rents and management authority."  "Key's actions were intentional and malicious."

4

paragraph, designated paragraph 9: " 'Key is solely liable for all Receiver costs and fees, including the Receiver's employees' costs and fees as have been, or are yet to be, determined to be reasonable and necessary by the Receivership Court expended by the Receiver from the date of appointment of the Receiver until the Receiver's discharge by the Receivership Court; however, the Receiver shall be paid such costs and fees out of the assets of the Receivership estate, and *Key shall therefore pay Trattmann, as damages, 100 [percent] of all such Receiver fees and costs already paid or to be paid out of the Receivership estate as approved by the Receivership Court.* To secure payment of these damages to Trattmann, all such costs and fees shall constitute a lien in Trattmann's favor against all properties herein described in which Key holds a 50 [percent] interest as tenants in common." (Italics added.)

Paragraph 9 of the final September 2007 judgment (paragraph 9), reads exactly as stated in the Minute Order. Paragraph 9 was not affected by our prior opinion remanding for a punitive damages trial and modifying the cost award.

At the punitive damages trial, the trial court found the four properties that remained in the receivership estate, which was owned equally by Trattmann and Key as tenants in common, had an "equity" value of approximately $3.1 million.[2] Following a hearing on September 13, 2011, the Receivership Court appointed Trattmann property manager in place of the court appointed receiver. It found: "Trattmann and Key's respective 50 [percent] interests in the properties on a liquidation basis are about $1.5 million each. The parties have been advised that the total current Receivership expense is just over $2 million. Key is solely responsible for those costs. Once finalized and approved by the court, the Receivership expense will constitute a lien against Key's interest in the four properties, effectively wiping out that interest."

---

[2]   Trattmann had purchased one from the receivership estate and four had been sold to third parties to finance the receivership. By "equity" value, we understand the trial court to mean market value less any encumbrances.

The receiver's motions to approve a final report and account, terminate the receivership, approve the final fees and costs of the receiver, approve the final fees and costs of special tax counsel, and approve disposition of the remaining receivership assets were heard on January 13, 2012.[3] Key once again sought credit for receivership costs that had already been paid. The Receivership Court agreed, concluding that Key "already paid his half when the properties were sold. He must pay Mr. Trattmann's half, but you don't get to collect the whole thing from him again. I agree with [Key] on that. If you want something different, you are going to have to seek a clarification [order from the trial court]." In an order entered on January 23, 2012, the Receivership Court approved total receivership costs of $2,179,461 (the January 2012 order) and stated: "19. To the extent that [income or proceeds from the Receivership estate were used to pay Receivership Expenses] any portion of any such utilization emanating from any property interest of the Defendant Key that was determined by the Judgment to have belonged, or continued to belong, to him, may constitute a credit or partial satisfaction of the Judgment in his favor, in an amount that may be determined [by] the Trial Court . . . and this Final Order shall be without prejudice to any such determination by the Trial Court . . . ."

As directed by the Receivership Court, Trattmann sought clarification of paragraph 9 from the trial court. It tentatively found: "Pursuant to the [September 2007] judgment . . . Trattmann is entitled to recovery of these costs from Key as damages. Key presents no authority for his argument that he is entitled to credit because the estate has paid the receiver's costs so no such credit has been given." At the hearing, the parties submitted without argument on the tentative. The final March 2012 clarification order states: "[Paragraph 9] is interpreted to mean that Key must pay Trattmann 100 [percent] of the Receiver's fees and costs, as damages payable to Trattmann personally, secured by

---

[3]    In a tentative statement of decision, the trial court found that from its inception on February 11, 2003, through November 30, 2011, the receivership had total receipts of $10,927,625.86 and total disbursements of $10,903,016.03, leaving a cash balance of $24,609.83 in the receiver's account, plus $9,180 of accrued interest from tenant deposits. The only debt of the receivership was a $150,000 loan, which was later satisfied.

6

a lien on Key's interest in the four remaining joint venture properties; and that no credit is attributable to Key on account of any contributions made from his share of the receivership estate toward Receiver fees and expenses."

Key timely appealed from the March 2012 clarification order.

## DISCUSSION

A.    <u>Case No.  B241337</u>

*The Damage Award of $2,179,461 Based On Receivership Costs Is Excessive*

Key challenges the March 2012 clarification order interpreting paragraph 9 to mean that, in addition to the $159,808.50 damage award, Trattmann is entitled to damages in an amount equal to all of the approved receivership costs (i.e. $2,179,461). Key argues that an award of the full amount of the receiver's costs without any reduction for costs already paid from Key's half of the receivership estate is excessive. We agree.

We review a claim of excessive damages for substantial evidence. (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 992.) "Damages must be assessed in the manner 'most appropriate to compensate the injured party for the loss sustained in the particular case.' [Citation.]" (*Kelly v. CB & I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 453, quotations omitted.) The measure of damages for fraud committed by a fiduciary is the "benefit-of-the-bargain" measure provided by Civil Code, sections 1709 and 3333.[4] (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240-1241.) To be awardable, damages " 'must be such as follows the act complained of as a legal certainty.' [Citation.]" (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364.)

---

[4]    Civil Code section 1709 provides:  "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

Civil Code section 3333 provides:  "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Here, the evidence established that the September 2007 judgment quieted title in the properties that comprised the receivership estate in Trattmann and Key in equal shares and awarded Trattmann compensatory damages of $159,808.50. In addition, Paragraph 9 ordered Key to "pay Trattmann, as damages, 100 [percent] of all such Receiver fees and costs already paid or to be paid out of the Receivership estate as approved by the Receivership Court. . . ." In September 2011, the trial court found the receivership estate had an "equity value" of approximately $3.1 million and that Trattmann's and Key's respective shares in the receivership estate had a "liquidation" value of $1.5 million. In January 2012, the Receivership Court approved total receivership costs and fees of $2,179,461, most of which had already been paid out of the receivership estate. Accordingly, payment of receivership costs over the course of the receivership had reduced the value of the entire receivership estate by $2,179,461. Since Trattmann and Key owned the receivership estate in equal parts, one half that amount was attributable to each of their shares. In other words, payment of $2,179,461 in receivership costs by the receivership estate reduced Trattmann's and Key's half of the estate by $1,089,730.50, each. Thus, the evidence established that Trattmann's damages related to the receivership costs were $1,089,730.50 – the amount by which his half of the estate was reduced. There was no evidence that Trattmann was damaged by the amount that Key's half of the estate was reduced by receivership cost payments. Therefore, a damage award of the full $2,179,461 that had been paid from the receivership estate was not supported by substantial evidence and was, as such, excessive. For this reason, we reverse the March 2012 clarification order and find paragraph 19 of the Receivership Court's January 13, 2012 order has essentially established the amount that Key must pay to pay Trattmann as damages based on the receivership costs.

B.      Case No. B243406

*Substantial Evidence Supports the Punitive Damage Award Based In Part on the Finding That Key Had A Net Worth of $1,505,291*

Key challenges the $150,000 punitive damage. He argues: (1) the evidence does not support the $1,505,291 net worth finding because the trial court's calculation did not take into account Key's liability for the receivership costs (which in part III.A.1. we found was $1,089,730.50); and (2) if correctly calculated, the punitive damage award improperly exceeds 10 percent of his net worth.[5] Trattmann counters that the receivership costs were an element of compensatory damages awarded by the trial court in Phase II and there is no authority for the proposition that a compensatory damage award is a liability which must be accounted for in calculating a defendant's net worth for purposes of assessing punitive damages. We find no error.

"We review the trial court's award of punitive damages for substantial evidence. [Citation.] 'An award of punitive damages hinges on three factors: the reprehensibility of the defendant's conduct; the reasonableness of the relationship between the award and the plaintiff's harm; and, in view of the defendant's financial condition, the amount necessary to punish him or her and discourage future wrongful conduct. [Citations.]' [Citation.]" (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679 (*Baxter*); see also *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 76-77 (*Bankhead*) [trial court reviews a motion challenging excessiveness of a punitive damage award as a "thirteenth juror," but appellate court applies the substantial evidence standard].) Key's contention involves only the third factor, his financial condition.

Punitive damages are intended to punish the defendant. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110.) Therefore, the amount should not be so low that the

---

**5**      Key does not challenge the ratio of punitive damages to compensatory damages. While the two must bear a reasonable relationship, there is no fixed formula. (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 563 [no fixed formula but a single digit ratio is likely to satisfy due process].) We note that the ratio of compensatory damages (not including receivership costs) to punitive damages in this case is 1:1.

9

defendant can absorb it with little discomfort, and not so high that it financially destroys the defendant. (*Id*. at p. 110; see also *Simon v. San Paolo U.S. Holding Col, Inc.* (2005) 35 Cal.4th 1159, 1185.) Generally, punitive damages may not exceed 10 percent of a defendant's net worth. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596; see also *Boeken v. Philip Morris, Inc., supra,* 127 Cal.App.4th at p. 1697 ["California courts have routinely upheld punitive damage awards which amounted to a percentage of net worth from .005 percent [citation], to 5 percent [citation], and not exceeding 10 percent. [Citation.]"].)

But, because net worth is so easy to manipulate, courts have recognized that it is not the exclusive measure of a defendant's ability to pay punitive damages, although it is the most common measure. (*Bankhead, supra,* 205 Cal.App.4th at p. 79; *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582 (*Zaxis*); *Baxter, supra*, 150 Cal.App.4th at p. 680.) For this reason, courts have upheld even punitive damage awards that exceed the defendant's net worth where the defendant's ability to pay could be inferred from other evidence. In *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 618-622 (*Rufo*), for example, the court upheld a $25 million punitive damage award where the defendant's net worth was only $15.7 million, reasoning that there was evidence that the present value of the defendant's future earnings was $25 million. In *Bankhead, supra*, at page 83, the court upheld a $4.5 million dollar punitive damage award despite evidence that the defendant had a negative net worth. It reasoned that the jury was entitled to credit an expert's testimony that the defendant was far wealthier than its stated net worth would indicate. And in *Zaxis, supra*, at page 583, the court upheld a $300,000 punitive damage award where the defendant had a negative net worth, but a $50 million credit line of which $44.7 million was available.

In calculating net worth, evidence of liabilities must accompany evidence of assets. In *Baxter*, the court reversed a punitive damage award where the record showed that the defendant owned substantial assets, but was silent with respect to the defendant's liabilities. (*Baxter, supra*, 150 Cal.App.4th at p. 680.) Here, the trial court calculated Key's net worth by adding the fair market value of each property in which Key had an

10

interest (100 percent of those in the LLC's and 50 percent of those in the receivership estate), less any mortgages and liens. From that subtotal, the trial court subtracted judgment liens against Key that had attached to some of the California properties. Thus, unlike in *Baxter,* the trial court took into consideration Key's liabilities in calculating his net worth.

Neither party has cited, and our independent research has not found, any case that discusses whether a compensatory damage award should be treated as a liability in assessing a defendant's net worth for purposes of calculating punitive damages. The closest we have come is *Rufo, supra*, 86 Cal.App.4th 73, in which the $15.7 million net worth calculation did not include any deduction for the $8.5 million compensatory damage award. But there was no challenge to the net worth calculation in *Rufo* and a case is not authority for a proposition not considered. (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680.) We need not decide the issue here because, as we shall explain, even if Key's net worth were reduced by $1,089,730.50, leaving a total net worth of $415,560.50, there is substantial evidence that Key has the ability to pay the $150,000 punitive damage award.

Under the circumstances, although the $150,000 punitive damage award would be about 36 percent of $415,560.50, the trial court could infer that Key had the ability to pay the award from the rental income of the seven properties held in the three LLC's. Key's claim that he did not know what the property managers did with the rental income was simply not credible. We conclude that, in light of the extreme reprehensibility of Key's misconduct, the seriousness of the harm inflicted on Trattmann, and Key's ability to pay, the $150,000 punitive damage award did not present an undue hardship. It was reasonably necessary to achieve the goals of punishment and deterrence without being disproportionate to Key's ability to pay.

11

## DISPOSITION

The June 2012 punitive damage award is affirmed.  The March 2012 clarification order is vacated and the matter is remanded to the trial court with directions to modify the September 2007 judgment to include additional damages to Trattmann in the amount of one half the receivership costs paid from the receivership estate (i.e. $1,089,730.50) and punitive damages in the amount of $150,000.  Each party shall bear his own costs on appeal.


                                         RUBIN, J.

WE CONCUR:


        BIGELOW, P. J.


        FLIER, J.