Filed 9/26/16  Pourteymour v. Mani CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RAMIN POURTEYMOUR, | D067225 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00100146-CU-DF-CTL) |
| NASRIN MANI, | |
| Defendant and Respondent. | |
| NASRIN MANI, | D067281 |
| Cross-complainant and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00100146-CU-DF-CTL) |
| RAMIN POURTEYMOUR, | |
| Cross-defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kevin A.

Enright, Judge.  Affirmed.

Friedhofer, James Friedhofer; Law Office of Douglas R. Reynolds, Douglas R. Reynolds; Horvitz & Levy, Peter Abrahams, David M. Axelrad; Byron & Edwards, Thomas W. Byron and Robert Scott Norman for Plaintiff, Cross-defendant and Appellant.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Kirby Noonan Lance & Hoge, Michael L. Kirby; Grimm, Vranjes & Greer, Mark Vranjes, Stephen P. Conching; Tyson & Mendez and Mina Miserlis for Defendant, Cross-complainant and Respondent.

In this case, we reject plaintiff, cross-defendant and appellant Ramin Pourteymour's principal contention the jury's verdict in this case must be reversed because of jury misconduct; we also reject his additional claims that the trial court erred in excluding evidence Pourteymour offered and that the jury's award of $2.5 million in punitive damages was excessive. Accordingly, we affirm the $2.75 million judgment entered in favor of defendant, cross-complainant and respondent Nasrin Mani.

SUMMARY

Both Pourteymour and Mani emigrated to the United States from Iran and made very successful careers here. Because of their shared heritage they became friends, and Mani used Pourteymour's services as a real estate investment advisor. However, after some investments did not turn out as well as Mani and her husband expected, Mani ceased doing business with Pourteymour. Thereafter, Pourteymour sued Mani and her husband for slander, among other claims; the suit was settled in 2009. This proceeding, a second slander action, was commenced in 2012.

Our review of the record shows Mani did a fairly convincing job of demonstrating

2

that Pourteymour's current slander claims against her were meritless.  The record shows that, with conflicting documentary evidence and witness testimony, Mani very effectively impeached the principal witness Pourteymour offered in support of his claims that Mani had disparaged his competence and honesty.

By the same token, the record also shows that Mani did establish one of the allegations of the slander cross-complaint she brought against Pourteymour.  She alleged Pourteymour had told mutual acquaintances that, although Mani is married, Mani had attempted to seduce him and had disrobed in front of him.   At trial, Pourteymour did not deny repeatedly making this statement; rather, he asserted it was true.

Given this record—which shows that Pourteymour initiated meritless claims against Mani and exposed himself to substantial liability to her for his own misconduct—it is not altogether surprising that, after the jury was excused to begin deliberations and apparently even before the jury had selected a foreman, one juror inquired of other jurors: "Why would someone file a lawsuit like this?"

Another juror responded to this question with his appraisal of Pourteymour:  "He probably wasn't very happy he got fired from his job by a woman who was also Persian." For the most part, Pourteymour's appeal rests on the impact this reference to the parties' Persian culture had on trial court proceedings.

When this colloquy between jurors came to the attention of the trial court during the second day of deliberations, the trial court, with the assistance and acquiescence of counsel for the parties, carefully and fully investigated whether the statement exhibited the sort of bias which would require that the juror who responded be excused or was

3

merely a benign expression of the juror's own life experience brought to bear with respect to a matter in dispute between the parties. During the course of the trial court's inquiry, it became apparent that, rather than reflecting any material impact on other jurors or improper bias, disclosure of the colloquy may have been driven by differences between the jury foreman, who reported the colloquy, and the juror who offered his opinion as to Pourteymour's motives, as to the merits of the parties' claims. This inference grew out of the fact that the jury foreman did not make any report of it until a day after it occurred and differences between jurors on the merits had become evident, and the fact that at least one other juror insisted on being heard on the issue and in support of the juror who had opined with respect to the role Pourteymour's Persian heritage played in his behavior.

Following its inquiry, the trial court believed that it had two alternatives. Because of the apparent division in the jury as a whole as to the merits and between the foreman and the juror who made the controversial statement, the trial court determined that if it excused the juror who made the statement, it would also have to excuse the jury foreman so as not to suggest to the jury that the trial court supported the foreman's view of the merits. On the other hand, the trial court believed it could also admonish the jurors about their duty to act in an unbiased fashion and obtain from them a renewed commitment to do so. The parties and, in particular, Pourteymour, did not want *both* the foreman and the juror excused and did not object to the trial court's proposal that the jurors simply be admonished.

The trial court did not abuse its discretion in determining that, if it excused the juror who made the statement, it would also have to excuse the foreman; given the

4

apparent differences with respect to the merits, the trial court could properly conclude that, in order to avoid making any suggestion with respect to the merits, both the juror and the 0foreman would have to be excused. Pourteymour's apparent unwillingness to excuse the foreman largely forecloses any contention on appeal that the trial court erred in admonishing and retaining the juror who made the statement about his heritage.

Moreover, as we explain more fully below, in dealing with the issues that arose as a result of the juror's statement, the trial court did not abuse its discretion in admonishing the jurors rather than excusing the juror. A juror may, as appears from the record here, make statements which, although they concern the gender, ethnicity or race of parties or witnesses, merely express the juror's life experience with respect to an issue in controversy at trial. (See *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 66, 76 [no misconduct in juror statement that " 'Hispanics . . . never cheat on time cards,' " rather permissible reliance by juror on life experience] (*Allen*); *People v. Wilson* (2008) 44 Cal.4th 758, 824-825 [African-American juror should not have been excused for telling other jurors in death penalty case they did not understand what it was like to grow up as a black child; again, statement merely reflected juror's life experience] (*Wilson*).)

FACTUAL AND PROCEDURAL BACKGROUND

A. Parties

Mani was born in Iran, and her native language is Farsi. She is a physician and ophthalmologist, as are her two brothers. Mani and her brothers own an ophthalmology clinic in Chula Vista, as well as a satellite clinic in El Centro. In addition, Mani owns and operates a cosmetic care clinic in La Jolla.

5

Mani is married to Darush Mohyi, who is also a physician. Mohyi practices in an Orange County clinic, as well as at a satellite office located in Mani's La Jolla cosmetic care clinic. Mani and Mohyi live in La Jolla.

Pourteymour also immigrated to the United States from Iran. He came here at the age of 14 with his parents, went to a local high school, and became an airline pilot. Although he is not a licensed financial advisor, real estate salesperson or broker, he began putting together real estate partnerships with other pilots; Pourteymour would often charge his investment partners a finder's fee for property he found and use the finder's fee as his capital contribution to a venture.

B. Investments

Mani, Mohyi and Pourteymour socialized in the Persian community in La Jolla and met at some point in 2005 or 2006. Both Mani and Mohyi became very close to Pourteymour and they saw each other five or six times a week for dinner, drinks and backgammon.

At one point, Mani and Mohyi loaned Pourteymour $1 million, which he used to acquire a home in La Jolla. After he acquired the home, Pourteymour convinced Mani and Mohyi to use the proceeds of loan to invest in a commercial building he owned. Mani and Mohyi invested in other real estate ventures Pourteymour owned and hired him as an investment consultant for two years.

C. First Lawsuit

In 2008, Mani and Mohyi became dissatisfied with the investments and investment advice offered by Pourteymour, and their investment and consulting relationship with

6

Pourteymour ended. Pourteymour then filed a complaint against Mani and Mohyi, which, among other claims, alleged causes of action for defamation. The lawsuit was settled in 2009. Also in 2008, Pourteymour was involved in a motorcycle accident in which he was severely injured; following the accident, he filed a complaint against the Harley-Davidson Motorcycle Company (Harley-Davidson). Harley-Davidson eventually prevailed in the litigation.

### D. These Proceedings

#### 1. *Pourteymour's Complaint*

In July 2012, Pourteymour filed a second lawsuit against Mani. Pourteymour alleged causes of action for slander, intentional infliction of emotional distress, interference with contractual relations, and interference with economic advantage. Pourteymour alleged these claims grew out of statements Mani made about him to others to the effect that Pourteymour: is a liar; provides sex to a wealthy, elderly woman in exchange for money to pay his mortgage; has lost money for all the pilots who have done business with him; is a thief and corrupt; is being investigated by the San Diego Chief of Police; has had his home raided by the FBI; should not be allowed to borrow from a local bank; has never been an airline pilot; should not be trusted; and has stolen millions from Mani and her family. The complaint further alleged that Mani told others that Mani bought his home for him.

#### 2. *Mani's Cross-Complaint*

Mani responded to the complaint by filing an answer that denied all material allegations of Pourteymour' complaint; Mani also filed a cross-complaint against

7

Pourteymour. Mani's cross-complaint alleged a single cause of action for slander; in particular, she alleged Pourteymour had told at least one other person that Mohyi had paid Pourteymour "$1,000,000 so that Pourteymour would have sex with Dr. Mani" and that "Mani had undressed in front of Pourteymour and begged him to have sex with her."

3. *Trial*

i. Pourteymour's Case Against Mani

In support of his claims against Mani, Pourteymour relied on the testimony of his friend and banker, Sandra Redman. Redman was the manager of the private banking division of California Bank & Trust (CBT), where Pourteymour had approximately $7 million in outstanding loans that Redman managed for the bank. Pourteymour and Redman were also close, personal friends. Mani's brother also banked at CBT, where the family's business accounts were managed by Redman.

In the spring of 2012, Pourteymour and Redman were disappointed that Pourteymour's attempt to join the community advisory board of a local hospital had apparently been thwarted by Mani, who had admitting privileges at the hospital and had related to a hospital administrator that she had been sued by Pourteymour and would not be comfortable at hospital fundraising events if Pourteymour were present. According to Redman, thereafter she received treatment from Mani at her cosmetic care clinic and later spoke to Mani on the telephone about Pourteymour. Redman testified during that conversation Mani made the slanderous statements which were the basis of Pourteymour's claims against Mani.

As we indicated, Mani impeached Redman's testimony. Mani did so by calling

8

Redman's coworkers and supervisor, who testified that Redman had not documented what Mani allegedly told her about Pourteymour's character or alerted anyone else in the bank about the information and that, given Pourteymour's substantial outstanding loans, she should have done so. Mani was also able to show through telephone records and records of her own patient schedule that it was somewhat unlikely that she had the lengthy telephone conversation with Redman on the date Redman claimed the conversation occurred.

Mani also presented evidence from a woman Pourteymour had been dating in 2011 and 2012, Aloha Taylor. Taylor testified that Pourteymour seemed obsessed with Mani and, at one point, approached her and asked her to give false testimony against Mani.

### ii. Mani's Claims against Pourteymour

As we noted, Pourteymour did not deny making statements to a number of other people in the Persian community to the effect that Mani wanted to have sex with her and on one occasion disrobed in front of him at his home. Rather he claimed the incident was true and that in fact he did have sex with her at his home. Mani denied having any sexual interest in or activity with Pourteymour.

### 4. *Jury Deliberations*

After nearly a month of trial, the parties presented their closing arguments. During his closing argument, in the course of discussing Pourteymour's initial lawsuit against Mani, Mani's counsel told the jury: "to have Dr. Mani, and I would suggest to you particularly in this culture, a woman, tell [him] that she doesn't need his services because

9

they're of no value, what she got for that was a lawsuit." Although Pourteymour was represented by counsel with respect to his claims against Mani and separate counsel with respect to Mani's claims against him, neither counsel made an objection to this argument.

Following argument, the jury was instructed and retired. The following morning, after a full day of deliberation, the trial court received a note from the jury foreman, Juror No. 8. The note stated that another juror, Juror No. 11, "voiced his bias towards the Persian culture and women." With the consent of counsel, the trial court investigated this claim. The trial court spoke individually to Juror No. 8 and to Juror No. 11. Juror No. 11 explained that after the jury was excused, but before they had even chosen the foreman, another juror asked him why someone might bring this lawsuit. According to Juror No. 11, he responded by stating: "He probably didn't like the fact that, one, he couldn't continue his job; and he probably didn't like the fact that he got fired by a woman, especially a Persian woman."

Mani's counsel responded to what Juror No. 8 reported and what Juror No. 11 stated by arguing that he believed that, based on the fact Juror No. 8 waited a full day before reporting what he heard, there was a real possibility Juror No. 8 was not so much concerned about what Juror No. 11 said, but rather was attempting to have Juror No. 11 discharged because he disagreed with Juror No. 11 with respect to the merits. Mani's counsel urged the trial court to question other jurors to confirm his concern. Literally, while the trial court was considering counsel's argument, the bailiff gave the trial court a note which stated a third juror, Juror No. 10, was "adamant you should speak to all jurors."

10

The trial court then spoke again to Juror No. 8, who conceded that a majority of the jury objected to him sending in the note. The trial court then spoke to Juror No. 10 individually. Juror No. 10 reported that, during their deliberations the previous day, the jury had been making progress and that the rest of the jury was shocked when that morning the foreman wanted to send the trial court a note about Juror No. 11. Juror No. 10 believed it was unfair the foreman singled out Juror No. 11. Juror No. 10 also believed that there seemed to be some friction between Juror No. 8 and Juror No. 11. Finally, Juror No. 10 stated that he had not heard Juror No. 11's remark.

After speaking individually to Juror No. 8, Juror No. 11, and Juror No. 10, and based on the evidence there was some discord between Juror No. 8 and Juror No. 11, as well as potential differences on the merits within the jury, the trial court expressed its concern that discharging only Juror No. 11 might send the jury a message with respect to the court's view of their differences. The court stated: "I think it's problematic in terms of jurors fairly and impartially reviewing the evidence, deliberating and discussing, if I'm removing one and not the other. And I think that's problematic." Rather than remove any jurors, the trial court advised the parties it would talk to Juror No. 8, Juror No. 11 and Juror No. 10 and ask them individually if they could be fair and impartial going forward. As we discuss more fully below, the parties did not object to the trial court's proposal. Thereafter, the trial court spoke again individually to Juror No. 8, Juror No. 11 and Juror No. 10, and they each assured the trial court they could be fair and impartial.

### 5. *Verdict*

The jury returned a verdict in favor of Mani on Pourteymour's complaint against

11

her.  As to some specific slander allegations, the jury was unanimous, as to others, it was divided 11 to one in Mani's favor or nine to three.

The jury's verdict was also in Mani's favor on her cross-complaint against Pourteymour.  The jury unanimously agreed Pourteymour had told others Mani had disrobed in front of her and that he had sexual relations with her.  The jury was divided 10 to 2 with respect to whether Mani actually disrobed in front of him, and the jury was divided 9 to 3, with respect to whether Pourteymour had sexual relations with Mani.  The jury found Mani had suffered $250,000 in damages.

In a separate punitive damages portion of the trial, the jury imposed $2.5 million in exemplary damages.

DISCUSSION

I

As we indicated at the outset, on appeal Pourteymour's principal contention concerns Juror No. 11's statements with respect to the parties' Persian heritage.  In light of those statements, Pourteymour argues the trial court erred in failing to excuse Juror No. 11 and thereafter in failing to grant Pourteymour's motions for a mistrial and a new trial.  As we explain more fully, Pourteymour largely consented to the trial court's determination of the issue, and, in any event, Juror No. 11's statements did not warrant his removal from the jury.

A.  Juror Misconduct

Claims of juror misconduct pose particular and difficult challenges for trial courts.  Quite recently, the Supreme Court considered a claim of juror misconduct in a death

penalty case and found that, in the end, in the course of investigating the misconduct claim, the trial court unnecessarily interfered in the jury's deliberations and erred in removing a juror.  (*People v. Nelson* (2016) 1 Cal.5th 513 (*Nelson*).)  In *Nelson*, the court noted:  "Our state Constitution independently declares that '[t]rial by jury is an inviolate right and shall be secured to all . . . .'  (Cal. Const., art. I, § 16.)  We similarly have emphasized that the federal and state constitutional right to a trial by an impartial jury includes the right to a jury 'in which no member has been improperly influenced' and that protecting a jury's impartiality ' "assures the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes." ' "  (*Id*. at p. 568.)  Thus, " 'an important element of trial by jury is the conduct of deliberation in secret, free from " ' "intrusive inquiry into the sanctity of jurors' thought processes."  [Citation.]' " [Citation.]  Secrecy affords jurors the freedom to engage in frank discussions, free from fear of exposure to the parties, to other participants in the trial, and to the public. [Citations.]  The mental processes of deliberating jurors are protected, because "[j]urors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny.  The very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations.  The danger is increased if the attorneys for the parties are permitted to question individual jurors in the midst of deliberations.'  [Citation.]"  (*Id*. at pp. 568-569, italics omitted.)

Nonetheless, "the secrecy of deliberations 'may give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed

13

misconduct.' [Citation.] Even then, however, trial courts 'must exercise care in responding to an allegation from a deliberating jury that one of their number is refusing to follow the court's instructions or is refusing to deliberate' or is engaging in any form of juror misconduct. [Citation.] [¶] . . . [¶] Thus, a trial court may intervene in jury deliberations where it receives reports of juror misconduct or in response to an impasse, but such interventions must be limited and undertaken with the utmost respect for the sanctity of the deliberative process." (*Nelson*, *supra*, 1 Cal.5th at p. 569.)

In *Nelson*, during the penalty phase of the jury's deliberations, the jury appeared deadlocked. In responding to the deadlock, the trial court gave the jury a questionnaire prepared by the prosecutor, which among other matters asked each juror whether there was anything the trial court might do to assist the jury in reaching a verdict. The responses the trial court received led to further investigation by the trial court, which excused one of the two holdout jurors on the grounds that she had not fully and honestly responded to voir dire questions. On appeal, the trial court found the questionnaire and the removal of one of the two holdout jurors was prejudicial error because it put pressure on all the jurors to go along with the majority. The court found that taken together, the questionnaire and the removal of the holdout juror conveyed a message that the trial court's inquiry and concern was directed at holdout jurors, not jurors in general. (*Nelson*, *supra*, 1 Cal.5th at pp. 569-570.) *Nelson* makes it plain the very process by which a trial court investigates claims of juror misconduct may itself improperly intrude upon and influence jury deliberations. There is of course no doubt that "[a] juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge."

14

(*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051(*Barnwell*).)  On the other hand, " 'Jurors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' "  (*Allen*, *supra*, 53 Cal.4th at p. 76, quoting *People v. Fauber* (1992) 2 Cal.4th 792, 839.)  " 'Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work.' [Citation.]  '[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence.  We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. . . .  [¶]  A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting "an opinion explicitly based on specialized information obtained from outside sources," which we have described as misconduct.' [Citation.]  '[T]he jury is a "fundamentally human" institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution.' "  (*Wilson*, *supra*, 44 Cal.4th at p. 830.)

The fine line between impermissible bias and inevitable life experience can, in important respects, be discerned in the circumstances and dispositions of our Supreme Court in *Barnwell*, *Allen* and *Wilson*.  In *Barnwell*, the trial court discharged a juror in a death penalty case because the court found, based on its interview with other jurors, that one juror was unwilling to believe the testimony of police officers.  (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.)  In finding no error in the trial court's discharge of the juror, the Supreme Court stated:  "The totality of the evidence here supports the trial court's evident

15

conclusion that, more than simply disbelieving the testimony as given by these particular witnesses, [the juror] judged their testimony as given by a different standard because the witnesses were police officers.  Applying such different standards to the evaluation of different witnesses is, of course, contrary to the court's instructions and violative of the juror's oath of impartiality."  (*Ibid*.)

In *Allen*, the trial court discharged a juror who found a prosecution witness not credible.  The prosecution witness claimed he had seen a multiple homicide even though a timecard at his place of employment showed that he was at work at the time of the homicides.  The witness explained that a Hispanic coworker, Jose, often punched his timecard in for him.  The juror did not believe this aspect of the witness's testimony and stated: " 'I know Hispanics, they never cheat on timecards, so this witness . . . was at work, end of discussion.' "  (*Allen*, *supra*, 53 Cal.4th at p. 66.)  In finding this statement did not represent any misconduct and that the trial court erred in discharging him, the Supreme Court stated:  "[The juror's] positive opinion about the reliability of Hispanics in the workplace did not involve specialized information from an outside source.  It was an application of his life experience, in the specific context of timecards and the workplace, that led him to conclude [the witness] was not telling the truth about the shootings."  (*Id*. at p. 78, fn. omitted.)  In distinguishing *Barnwell*, the court stated:  "[The juror] here expressed no general bias against any group of which the witness . . . might have been a member.  Rather, he drew on his own personal life experience to conclude this witness lacked credibility because of the explanation he gave for a critical discrepancy.  [¶]  It may be argued that [the juror's] conclusion was based upon a weak premise or rested

16

upon an overbroad inference.  Jurors, however, are the judges of credibility, and conscientious jurors may come to different conclusions.  It is not the province of trial or reviewing courts to substitute their logic for that of jurors to whom credibility decisions are entrusted.  '[T]hat a juror does not deliberate well or relies upon faulty logic or analysis . . . is not a ground for discharge.' "  (*Allen*, at p. 78.)

In *Wilson*, the trial court also discharged a juror for alleged bias.  *Wilson* was also a death penalty case and the defendant was an African-American.  In the penalty phase of the case, an African-American juror stated he believed the defendant experienced more abuse as a child than had been disclosed at trial and further that the other jurors would not understand because they were not African-American.  In particular, the trial court found the juror made the following statements:  " ' "You don't understand because you're not black." . . .  "Black people don't admit being abused."  "Black kids have a different relationship with their fathers." ' "  (*Wilson*, *supra*, 44 Cal.4th at p. 818.)  In finding that these statements did not warrant the juror's discharge, the Supreme Court stated:  "A juror whose personal view was that African-American defendants *never* should, or *always* should, receive the death penalty commits clear misconduct, both by not considering the particular facts of the case and by making the penalty decision based on racial bias.  It would be equally objectionable were a juror to conclude *a particular defendant* deserved the death penalty or life imprisonment because of his or her race.  *But relying on an understanding, based on personal experience, of the effects of certain social environments and family dynamics on a young person growing up, when this understanding illuminates the significance or weight an individual juror would accord to*

17

*related evidence in a particular case, is not misconduct.*" (*Wilson*, *supra*, 44 Cal.4th at p. 831, italics added to last sentence.)

B. Waiver

Mani argues Pourteymour waived any objection to Juror No. 11's statement about the parties' Persian culture. We largely agree.

As we have discussed, following the trial court's investigation of Juror No. 11's statement, the trial court expressed its concern that, if it discharged Juror No. 11, it would also have to discharge the jury foreman.

In reaching this conclusion, the court in no sense abused its discretion or otherwise erred. Rather, in recognizing the potential that discharging Juror No. 11 alone might interfere in the jury's deliberations, the trial court simply fulfilled the responsibilities recently discussed by the Supreme Court in *Nelson*.

The record is also clear Pourteymour acquiesced in the trial court's conclusion about its alternatives. Immediately after the trial court advised the parties that it believed the foreman would have to be discharged if Juror No. 11 was discharged, and that rather than discharge any jurors, it proposed simply once again inquiring whether the three jurors believed they could be fair and impartial, on the record all counsel agreed. In particular, defense counsel for Pourteymour promptly stated: "I have no objection to that." Very shortly later in the proceedings, counsel prosecuting Pourteymour's claims against Mani, also expressly agreed to the trial court's proposal.

Thus, in simple practical terms, the record here shows Pourteymour and his counsel were presented with a fairly clear choice: they could make an express and

18

unambiguous objection to the trial court's decision to leave Juror No. 11 on the jury and run the very real risk that the trial court would also excuse Juror No. 8, who appeared to be favoring Pourteymour, or agree with the trial court's disposition of the bias issue. In an apparent decision to keep Juror No. 8 on the jury, Pourteymour and his counsel chose the latter course. In doing so, Pourteymour plainly waived any objection on appeal to the trial court's proposal.

It is axiomatic that in the trial court a party may not withhold an objection to evidence or procedure, wait for the trial court's decision on the merits, and then raise the objection on appeal if the party receives an adverse ruling on the merits. (*Tyler v. Norton* (1973) 34 Cal.App.3d 717, 722; see also *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 262, 247 [appellant forfeits trial court's failure to poll juror by not raising issue]; *People v. Stanley* (2006) 39 Cal.4th 913, 950-951 [specific objection to juror misconduct required to preserve issues on appeal].) Litigants "cannot play 'Heads I win, Tails you lose' with the trial court." (*Tyler v. Norton, supra*, at p. 722.) This is of course especially apt here, where the trial court's ruling at least in part benefitted the appealing party: here, the trial court's resolution not only kept Juror No. 11 on the jury, but also Juror No. 8.

We recognize that, later in the deliberations, counsel prosecuting Pourteymour's claims against Mani asked for a mistrial because he believed that both Juror No. 11 and Juror No. 10 were wearing Harley-Davidson T-shirts and because evidence of Pourteymour's unsuccessful personal injury litigation against Harley-Davidson had been presented at trial; he argued that in context the T-shirts showed bias against his client. Pourteymour's defense counsel expressly did not join in the motion. Because it involved

19

a great deal of speculation as to the meaning of the T-shirts, the trial court denied the motion. The later objection to the T-shirts, especially because Pourteymour's defense counsel did not join in the motion, was not directed at Juror No. 11's remarks and did not clearly challenge the trial court's determination that if Juror No. 11 was discharged, Juror No. 8 would be discharged as well. Thus, it did not preserve the trial court's resolution of Juror No. 11's remarks as grounds for appeal.

C. Juror No. 11's Statements

Notwithstanding Pourteymour's acquiescence in the trial court's decision to keep both Juror No. 11 and Juror No. 8 on the jury, Juror No. 11's remarks did not provide any basis for removing him. The remarks plainly fell within the category of life experience which jurors may bring to bear in considering specific issues raised by the parties at trial. (See *Allen*, *supra*, 53 Cal.4th at p. 78; *Wilson*, *supra*, 44 Cal.4th at p. 831.) Pourteymour's motive for bringing claims against Mani was, without objection, expressly raised by her attorney in his closing argument; as we have noted, without objection, counsel stated that the parties' culture played a role in Pourteymour's reaction to being discharged by Mani. In repeating this argument almost verbatim, Juror No. 11 did not engage in conduct which suggested that he could not act fairly and impartially but merely, as in *Allen* and *Wilson*, brought to bear his own life experiences. Thus, the trial court did not err in its disposition of the statements Juror No. 11 made at the outset of the jury's deliberations.

## II

Pourteymour also argues the trial court should have granted his motion for a

mistrial, which, as we have noted, was based on the fact Juror No. 10 and Juror No. 11 were seen wearing Harley-Davidson T-shirts. Although Pourteymour was injured in a motorcycle accident and made unsuccessful claims against Harley-Davidson and that circumstance was presented to the jury, the fact that, like Pourteymour himself, two jurors appeared also to be motorcycle enthusiasts was no grounds for concluding that the jurors were biased against Pourteymour, or had otherwise engaged in any misconduct.

III

In an effort to support his claim Mani told Redman he was a "crook," Pourteymour offered testimony from friends who had allegedly heard similar remarks. The trial court permitted testimony from witnesses who claimed to have heard the remarks in 2012. However, Pourteymour also offered testimony from a La Jolla real estate agent and friend, Maxine Gellens; if permitted, Gellens would testify that in 2008, Mani contacted her, they met, and Mani disparaged Pourteymour's honesty and integrity. The trial court excluded Gellens's proposed testimony on the grounds that its probative value was outweighed by its remoteness in time and the undue consumption of time it would involve. (Evid. Code, § 352.) The court was also concerned about the fact that the alleged statements may have been within the scope of the parties' first settlement agreement.

We review the trial court's ruling on the proffered Gellens's testimony for abuse of discretion. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639-640.) Given its remoteness in time and the potential of relitigating collateral issues with respect to the circumstances under which the statements to Gellens were

allegedly made, we find no abuse of discretion.

IV

Finally, Pourteymour challenges the jury's imposition of $2.5 million in punitive damages. We find no error.

In establishing Pourteymour's net worth, as required by *Adams v. Murakami* (1991) 54 Cal.3d 105, 111-112, Mani relied on a 2011 financial statement Pourteymour had given CBT at the time he obtained loans from the bank. The 2011 statement showed that Pourteymour had a net worth of $30.5 million. Mani also relied on the fact that, during the course of the parties' 2014 trial, he had obtained $10 million in refinancing from another bank, as well as his concession at trial that the bulk of his assets consisted of real estate holdings and that, since the time of his 2011 financial statement, the value of real estate had increased.

Contrary to Pourteymour's argument on appeal, this record was sufficient to show that he had a net worth in excess of $30 million. While it is true his 2011 financial statement was three years old at the time of trial, that fact went to its weight, not the sufficiency of all the evidence Mani presented on the issue. Indeed, the relatively large size of Pourteymour's net worth was corroborated by Pourteymour's ability to obtain a several million dollar loan at the time of trial. (See *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 583 [ability to borrow substantial sums evidence of ability to pay punitive damages].) Thus, we reject his contention that Mani failed to establish his net worth.

We also reject his contention that the $2.5 million imposed was excessive. It was

less than 10 percent of Pourteymour's likely net worth, and only a multiple of 10 times Mani's compensatory damages. As such, it was well within the general parameters our courts have set on punitive damages. (See *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1166; *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182, fn. 7.)

Finally, Pourteymour's conduct certainly warranted imposition of substantial exemplary damages. His statements about Mani, which he conceded making to a number of people, were false, degrading and humiliating, and plainly designed to severely damage Mani's reputation in the community in which she lived and worked. (See *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 713.)

## DISPOSITION

The judgment is affirmed. Mani to recover her costs of appeal.


BENKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

23